CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

September 29, 2025

LAURA A. AUSTIN, CLERK
BY:  s/J.Vasquez
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **THOMAS R. CRAIG, JR.,** | ) | |
| **Plaintiff,** | ) | **Civil Action No. 7:23cv00656** |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **MR. THOMPSON, et al.,** | ) | **By:  Robert S. Ballou** |
| **Defendants.** | ) | **United States District Judge** |

Thomas R. Craig, Jr., a Virginia inmate proceeding *pro se*, has filed this civil rights action against multiple defendants under 42 U.S.C. § 1983, alleging deliberate indifference to his serious medical needs regarding the treatment of broken fingers on his dominant right hand. Defendant N. Adams, an administrator at Bland Correctional Center (Bland), has filed a Motion to Dismiss, pursuant to FED. R. CIV P. 12(b)(6). The remaining defendants, Dr. Kevin Fox, T. Cox, RNs T. Thompson and B. Pratt, and LPNs M. Robertson and L. Tilley, have filed a Motion for Summary Judgment pursuant to FED. R. CIV. P. 56(c). Craig has filed a response to both motions. For the reasons stated below, I will deny the Motion to Dismiss and deny in part and grant in part the Motion for Summary Judgment.

## I.    FACTUAL BACKGROUND

On Saturday, March 11, 2023, around 9:15 p.m., Craig presented to the medical department at Bland with injury to the 4th and 5th fingers of his right hand, stating that his finger was closed in a window. According to Craig, the cut on his finger was so deep that the bone was visible. The night shift Lieutenant came to medical and looked at the wound and told Nurse Pratt to get Craig ready to be taken to the emergency room, but Pratt said, "he had it under control." ECF 42 at 1.

Nurse Pratt states that he immediately called Dr. Mathena after seeing Craig's injury and was told there was no need to take Craig to the emergency room if he could splint his finger, because that is all the emergency room would do.  Nurse Pratt then cleaned, closed, dressed, and splinted the finger and noted in the chart that Craig had a bleeding incision across the back of the 4th finger and a swollen first knuckle. ECF 37-3, ¶¶ 3-6. The 5th finger also had a cut across the cuticle.  Nurse Pratt noted that he was able to close the wound with glue and noted that Craig was to have an "x-ray to his L (sic) hand."  He gave Craig Tylenol for pain and told him to come back to the clinic the next day.  ECF 37-7.

Craig states that his bandage was covered in blood by the time he got back to his unit, and the charge officer called medical to report the bleeding. The officer then told Craig to return to medical the following day.  ECF 42 at 1–2.  According to the medical notes, Craig was seen on March 12 at 12:15 p.m.  Nurse Pratt noted a "large amount of sanguinous drainage" on the dressing.  Craig rated his pain at 7 out of 10.  Nurse Pratt changed the dressing, splinted Craig's fingers, and told him to come back daily for two weeks for dressing changes.   ECF 37-7 at 1 Craig was also prescribed seven days of the antibiotic Keflex at that time, recommended by Dr. Mathena when told that Craig had "closed his finger in a window."  *Id.*; ECF 37-3 ¶ 8.  In good record-keeping format, medical orders, prescriptions, and referrals were noted in the left margin, in red ink, signed by J. Cox, RN, when entered into Sapphire.  Cox acknowledged that "I sign off on the written chart each time I record an order."  ECF 37-2 ¶ 4.  The March 11 x-ray order, March 12 Keflex prescription, and order for two weeks of physical therapy were entered in Sapphire on March 14, 2023.  ECF 37-7 at 1.

According to the medical notes, Craig was seen by a Physician's Assistant (PA) on March 14, 2023, at 8:34 a.m.  At that time, Craig noted that he had lost feeling and power in the right

hand, which was his dominant hand.  After examining him, the PA noted that he had a "crush injury" to digits 4 and 5 of his right hand.  She recommended that he "continue splint—please reapply—Thx." *Id.* at 2.  She continued him on Tylenol and Keflex, advised him to keep his hand elevated and iced, ordered an x-ray of his 4th and 5th fingers, and wrote that he should return to medical for re-check in one week.  In the left margin in red ink, J. Cox signed under this note: "3/14/23 – noted in Sapphire; Scheduled x-ray; Scheduled F/U 3/22."  *Id.*

On Thursday, March 16, 2023, Craig's right hand was finally x-rayed.  Dr. Dorn's findings included a fracture of the proximal dorsal aspect of the distal phalanx of the fourth and fifth fingers.  He recommended additional x-ray views because the fracture in the fourth finger appeared to extend through a bone spur.  *Id.* at 3.  Dr. Mathena reviewed the x-ray report that same day.  In the file, he wrote, "Repeat R hand x-rays per radiologist. Refer to ortho – R 4th/5th finger fx's. Thx!"  A note in the left margin, in red ink, said "Copy to Patton and Tilley 3/16/23." In a darker red ink, right under Dr. Mathena's chart note, the file says "3/16/23 scheduled. J. Cox, RN," but did not say which appointment or when.  *Id.* at 2.  Dr. Mathena signed a Diagnostic Test Results form saying "x-rays show broken bones in your hand. You are being referred to orthopedics."  *Id.* at 4.  Craig received a copy of the form that same day.

Additional x-rays were taken on Friday, March 17, 2023.  *Id.* at 5.  Craig was seen for dressing changes on March 19 and 20.  *Id.* at 7.  On March 21, at 8:11 a.m., Craig was seen in medical for follow-up.  The photocopy of the doctor's notes is not terribly clear, but it appears that the doctor ordered continued dressing changes for another two weeks and added "Please refer to Dr. Gray, orthopedics," which was entered into Sapphire, with a copy to Tilley and Patton.

Meanwhile on March 21, Dr. Fox reviewed the March 17 x-ray report, interpreted this time by Dr. Williams, who reported degenerative changes, with no acute fracture or dislocation seen. *Id.* at 5. Another Diagnostic Test Results form was completed and stamped with Dr. Fox's signature, with the box checked saying "Lab/x-ray/procedure is within normal limits and/or clinically insignificant. The provider has not ordered a follow-up visit." *Id.* at 6. Craig received a copy that same day. ECF 42 at 2. When he went for dressing change on March 21 in the evening, he was not seen. At this point, he became upset and began filing complaints and grievances. ECF No. 11 at 3.

On March 23, S. Patton, R.N., entered a lengthy note in the chart. Craig's cousin had called, saying that Craig was upset that he would not receive any further treatment for fracture and hand. Nurse Patton then called Craig down to medical and noticed that his dressing was dirty, but intact. He stated that he had not come for a dressing change on March 22, because he was told on March 21 that he didn't need a dressing change and thought he wasn't going to get any more treatment. Nurse Patton asked Craig why he thought he wouldn't get more treatment, and he responded that he had gotten a letter from Dr. Fox. She asked to see the letter, and he showed her the Diagnostic Test Results form. Nurse Patton explained that the form was just reporting the x-ray result, and he still needed to have his dressing changed; further, he was not seen for dressing change on March 21 because he had already seen the doctor that morning. Nurse Patton indicated, and he verbalized understanding, that a referral for orthopedic evaluation had been made. Finally, he requested and was given more Tylenol for pain. ECF 37-7 at 9–10.

At 1:00 p.m. on March 28, Craig reported to medical complaining of pain in his right hand, even worse than the week before. He denied any new injury to the hand. He was kept in medical for observation. *Id.* at 12. While being monitored, his blood pressure was unusually

elevated, 140/87 at 5:00 p.m. and 149/89 at 11:00 p.m.  *Id.* at 13.  On March 29, he rated his pain

at 6 out of 10, saying that Tylenol and Motrin were not doing much.  On March 30, Dr. Mathena

saw Craig in follow-up and recommended continued daily dressing and splint changes, adding

"Appreciate Tilley expediting his ortho appt as soon as feasible. Thank you."  *Id.* at 15.  Craig

was returned from medical observation to general population at that time.

Dr. Fox saw Craig on April 3, 2023, in follow-up while awaiting his orthopedic

appointment.  His notes reflect that the hand looked unchanged from the prior week.  He tried to

some flexion and extension exercises on Craig's 4th and 5th fingers, stating that there was a

question of possible fracture, "although last x-ray stated no fracture."  *Id.* at 16.  Finally, he wrote

that patient "will continue with daily dressing changes . . . until ortho F/U next week."  *Id.*  That

was the last medical visit with a doctor in the Bland medical department until after Craig saw

orthopedist Dr. Gray on April 17.

On April 6, Craig sent several written complaints to Nurse Thompson at the medical

department.  At 1:05 p.m., he wrote:

> I've asked many times since 3-11-23 what will be done about my
> right hand. You've told me I'm scheduled to see the "ortho"; I have
> been patient up to a point.  This has gone on far too long to be
> considered adequate or timely medical treatment.  If in fact there is
> a break or fracture in my fingers, which is most likely the case since
> the bone in my ring finger was visible, at this point it has healed or
> attempted to heal, which will result in it healing wrong, as you can
> see from the shape of both fingers.  How do you plan on correcting
> this mistake?

ECF 1-1 at 12.  At 11:44 p.m., he wrote:

> I have a serious injury to my right hand, my ring finger and my
> pinkie finger is grossly misshaped, most likely broken, because the
> ring finger was showing the bone at the first joint at the time of
> injury, the tip was glued together and xrays (sic) showed possible
> "breakage" in both fingers.  I was scheduled to see the ortho on the
> 16th March 2023; I am very concerned because, (1) Why the delay,

5

> (2) there was an inmate who injuried (sic) his hand weeks <u>after</u> me
> and he has been treated already seen the orth and all.

*Id.* at 13.

No one responded to either of these complaints, or to any of the other complaints Criag

sent to medical on April 6, until April 14. Each complaint received the same response, dated

April 14, 2023, saying only "Your appointment with ortho is scheduled." *Id.* at 12, 13, 14.

Craig filed a regular grievance on April 6 as well, stating:

> I am growing very "concerned" over the treatment process with my
> right hand. I'm being told I'll see the ortho and this has gone on
> since 3-16-2023. There was an inmate with similar issues with his
> hand and his injury was [approximately] a week over from mine his
> has seen the ortho & been treated I have not seen one yet!? (sic) And
> my injury has (open) wounds as well as possible broken bones. You
> could clearly <u>see</u> bone sticking through the first joint on my ring
> finger. Since the injury I've had XRays and there is indications of
> "broken" bones, so why is it taking so long for me to receive proper
> medical treatment? By the time you get around to it, it'll be healed
> and disfigured, as it is becoming now.

*Id.* at 4. On April 13, the grievance was returned to him, with two boxes checked. The first said

that he failed to use the informal complaint process; the second said "insufficient information."

The response was signed by N. Adams.

On April 10, N. Adams accepted two grievances from Craig and issued receipts for them.

These complaints contained the same language as the April 6 written complaints quoted

previously. *Id.* at 26, 28. Another grievance was received from Craig on April 10, with the box

"written complaint attached" checked, stating it had been nearly a month since his injury and

reciting his concern that the delay in treatment will cause deformity and limited mobility. *Id.* at

6. This grievance was also returned to him, signed by N. Adams on April 13, with the same two

boxes checked, informal complaint process and insufficient information.

On April 13, Craig filed another grievance, noting that he had written at least three or four complaints about his medical need, but his complaints have been ignored. Over a month after his injury, he still had not seen the orthopedic doctor. *Id.* at 8. This grievance was returned with the same two boxes checked (informal complaint process and insufficient information) and a written note: "Please allow staff an opportunity to respond to your complaints. If you disagree with the response, resubmit." N. Adams signed this response on April 17, 2023. *Id.* at 9.

Although the medical department did not see Craig (other than for dressing changes that are not documented in the files provided), there is a note from L. Tilley, LPN, dated April 11, 2023, at 9:00 a.m. that an officer called her to report that Craig had said an ortho appointment was scheduled for April 12. She then called Dr. Gray's office to reschedule the appointment for April 17. ECF 37-7 at 20. In her affidavit, Tilley explains that she rescheduled the appointment per DOC policy: "no matter the circumstances and for reasons of security, if an inmate learns when an outside medical appointment is scheduled, the appointment must be cancelled and rescheduled. Security concerns include the possibility of an inmate arranging for family or friends to meet him, provide contraband, or to plan an escape." ECF 37-5 ¶ 6.

Dr. Kenneth Gray examined Craig on April 17, 2023, noting a lot of swelling, droop at the DIP joints on the 4th and 5th fingers of the right hand, tenderness at the base of the 4th finger, and a small distal indentation where Craig reported that he previously had a large swollen area. ECF 37-7 at 18. Because he did not have access to the original x-ray studies,[1] Dr. Gray took more images that day. After reviewing the x-rays from his office, Dr. Gray diagnosed a complete displaced intra-articular fracture of the proximal end of the distal phalanx at the DIP joint, with an intra-articular fragment involving about half the joint completely displaced

---

[1] In the Bland medical record, L. Tilley noted at 4:00 p.m. that she faxed the March 17 x-ray report to Dr. Gray's office. There is no mention of sending the March 16 x-ray report. ECF 37-7 at 20.

dorsally, on the 5th finger and a completely displaced intra-articular fracture of the distal and middle phalanx of the 4th finger. He noted that the fractures had healed with non-union. He recommended open reduction internal fixation (with pins) and reconstruction of both digits at the DIP joints, in hopes or retaining extensor function for the fingers. Dr. Gray further noted that because of the amount of damage, Craig may need another procedure to fuse the joints if the internal fixation did not restore function. *Id.* at 19.

Dr. Gray performed the surgery on May 2, 2023. Craig returned to Bland the same day, with instructions from Dr. Gray for splints over fingertips if "legal" and NSAIDS and mild Ultram or Tylenol. Dr. Gray also restricted him to use of one hand. *Id.* at 25. Bland's records note on May 2 state that Dr. Fox ordered Tylenol, 500 mg. twice a day, and Ibuprofen, 600 mg. twice a day, for 14 days. He ordered dressing changes daily at 5:00 p.m. beginning May 3 for 14 days. *Id.* at 26.

At 8:30 a.m. on May 3, 2023, an officer called down to the medical unit to say that Craig's dressing was saturated. The person who saw him in medical noted that there was blood on his right ring and pinky fingers only; the rest of the bandage was dry. Craig was advised that he was supposed to wait 24 hours for his dressing to be changed, and he became "argumentative" and unwrapped the outer dressing. The nurse then unwrapped part of the finger dressing to replace it. Nurse Thompson came in and told Craig that Dr. Gray wanted the dressing to stay on for 24 hours, and he reviewed the dressing change schedule and pain medication schedule with Craig. *Id.* at 26-27.

During the next week, Craig was seen twice for elevated blood pressure, attributed by medical to the pain from his surgery. *Id.* at 27-29. Dr. Gray saw Craig in follow-up on May 12, 2023, 10 days after the surgery, and removed his sutures. His chart notes state in bold typeface:

> We would like the patient to take the nonsteroidal and (sic) inflammatory medication regularly, keep this clean daily with peroxide.  Patient has multiple pin fixation [of] a comminuted fracture [and having] aluminum splints over this to protect it particular (sic) at nighttime and when doing other more aggressive activities would be very helpful in preventing the pins from displacing.  We want to see if we can leave the pins in for 6 weeks.

*Id.* at 33.  Nurse Robertson documented Craig's return from the outside appointment and wrote that continued daily dressing changes were needed.  Nurse Patton noted that, pursuant to instructions of the doctor, she cleaned Craig's wound with peroxide, changed his dressing, and used tongue depressors to splint his fingers.  *Id.* at 30.  On May 17, 2023, Craig filed an Emergency Grievance about the inadequacy of the tongue depressor splints, saying he wakes up every morning in pain from hitting the hand on something or rolling on top of it during his sleep.  ECF 1-1 at 24.  Nurse Thompson signed the form that day, saying "This is not an emergency as defined above."  *Id.*

Later that day, Craig filed a written complaint, saying "How do you consider 'tongue suppressors' adequate or effective medical equipment to use on broken bones?"  *Id.* at 23.  He added that the splints had been requested by the doctor for protection and stability of his fingers, and that the make-shift splint was inadequate for those purposes.  The response, signed by Nurse Thompson on June 6, 2023, said "You are receiving appropriate medical treatment."  *Id.*

In follow-up on June 9, following examination, Dr. Gray ordered physical therapy exercises to improve his range of motion. *Id.* at 37.  Two days later, Craig reported to medical because one pin had come out of his fourth finger. There was no bleeding. The area was cleaned and covered. Dr. Fox called Dr. Gray to seek guidance.  *Id.* at 38.

Craig filed a written complaint on June 18, 2023, saying that Mrs. Craig told him they would not be changing his dressings anymore. ECF 1-1 at 10.  On June 20, 2023, Craig sent a

written complaint that he had gone 72 hours without having his dressing changed or his hand

cleaned, even though he had stitches and pins in his hand. *Id.* at 11. That same day, Dr. Fox

ordered five more days of dressing changes. ECF 37-7 at 40. Response to Craig's written

complaints, both signed by Nurse Thompson, said "You are being seen by medical and receiving

dressing changes." ECF 1-1 at 10–11. On June 22, during dressing change, Nurse Pettrey noted

a small pus pocket around the pins in his pinky finger. She drained the pus, cleaned the wound

and re-dressed it. The doctor examined Craig the next day and said the finger looked great. ECF

37-7 at 42–43.

On June 26, Dr. Gray examined Craig, took repeat x-rays of the hand, and removed the

pins. He recommended physical therapy and supplemental stretching exercises for Craig to do

on his own. He continued to note the importance of using a splint during any type of heavy

activity. *Id.* at 46–47.

Craig was seen in the medical unit on June 27 for slight swelling in the right ring finger.

Upon removal of the bandages, the ring finger was whitish in color with wrinkled skin. After

cleaning, Nurse Hayes advised Craig to let the finger dry thoroughly before re-applying the

dressing before bedtime. She gave him the dressing supplies to take with him. *Id.* at 49.

On July 26, 2023, Dr. Gray saw Craig again. He took x-rays again and stated in the chart

that the "fourth and fifth digits remain in acceptable position. Alignment is good. Significant

arthritis in the interarticular joints of the DIP joints." *Id.* at 57. He noted that physical therapy

had not yet been available for Craig, because the previous therapist had rotated out and the new

one had not yet arrived. He ordered continued range of motion exercises, to be supplemented by

physical therapy when available. His chart note indicates that he expected Craig to have some

significant restriction in his motion, and Craig wanted to keep whatever motion he could because

he likes to play guitar.  If the function does not improve satisfactorily, further surgery to fuse the joints "in position of function" might be indicated.  *Id.* at 58.

Records show that Craig started seeing a physical therapist on August 2, 2023, for one visit a week.  He was discharged after the fourth visit on August 23 at his request.  *Id.* at 61. Dr. Gray saw him again on August 25.  Dr. Gray wrote that Craig's range of motion would continue to be restricted by the amount of arthritis that was present.  At some time in the future, going back in and "resecting some of that" might improve the range of motion. *Id.* at 63.  If joint pain becomes problematic, Dr. Gray recommended a fusion, but he acknowledged that Craig was "not at all inspired by that option."  *Id.* at 64.  He advised Craig to continue working the exercise program for range of motion on his own.  *Id.*

## II.  STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint.  The court must accept as true all properly pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor but need not accept conclusory statements.  *Langford v. Joyner*, 62 F.4th 122, 124 (4th Cir. 2023).  The court should not grant a motion to dismiss unless that plaintiff is clearly not entitled to relief under any possible construction of the allegations.  *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50 (1989).

A party is entitled to summary judgment only if there are no disputed issues of material fact, and the party is entitled to judgment as a matter of law.  Facts that could affect the outcome of the trial are material facts.  If a jury could return a verdict for either party, depending on which facts it believes, then the moving party is not entitled to summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

11

## III. DISCUSSION

### A. N. Adams – Motion to Dismiss

Ms. Adams has filed a motion to dismiss the claims against her under Rule 12(b)(6).

Craig's claim against Adams states:

> Mrs. N. Adams-HRA, she signed off on each complaint, grievance and at no time checked with M.D. or investigated to see if my complaint were serious enough to deem a medical emergency: See Documentation BOC-23-INF-0015.

ECF 11 at 14, ¶ 5.  The document referenced (and included *as part of the Amended Complaint*) is a receipt showing that Craig's grievance (informal complaint) had been filed; it states that she received the statement from him on April 10, and she types, in quotation marks, the plaintiff's complaint:

> I've had family & friends call about my injury, you say I'm 'exaggerating' as to the overall shape and look of the injuries on the fingers, on the ring finger bone was showing. Your CAN had to glue it back together, X-rays show possible breakage. Since I've yet to see a specialist (ortho) or anyone to determine how much damage was/is done: nerves, tendon, etc., one can only guess and hope.  At this point, if there is damage done it is almost beyond repair because you have waited so long to have it properly taken care of.

*Id.* at 30.  N. Adams then signed the form, so that Craig would have documentation of the filing.

Also included *as part of the Amended Complaint* is another grievance receipt typed and signed by N. Adams:

> I've asked many times since 3/11/23 what will be done about my right hand. You've told me I'm scheduled to see the ortho. I have patient (sic) up to a point. This has gone on for too long to be considered adequate or timely medical treatment.  If, in fact, there is a break or fracture in my fingers, which is most likely the case, since the bone in my ring finger was visible, at this point it has healed or attempted to heal, which will result in it healing wrong, as you can see from the shape of both fingers. How do you plan on correcting this mistake?

*Id.* at 29.

In ruling on a motion to dismiss, the court must liberally construe the complaint and all documents attached or incorporated into the complaint. *Riddick v. Barber*, 109 F.4th 639, 645 (4th Cir. 2024). In addition to the documents that were included in the Amended Complaint, Craig had previously filed 28 pages of grievances, written complaints, and similar documents regarding the issues involved in this lawsuit. *See* ECF No. 1-1. The court considers these documents, as well. *See King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016) (Stating in reversing dismissal of some claims on motion to dismiss, "Here, we look to King's complaint, including his attached statement of claims, and his notice of claim, including the grievance attachment, all filed pro se, in laying out the following factual allegations."). N. Adams rejected several of Craig's attempts to file grievances between April 6 and April 13. Every submission, whether rejected or logged with a receipt, expressed Craig's concern that he had not seen an orthopedic physician and that failure to address the fractures in his hand would lead to greater difficulty in treatment and possible permanent disfigurement.

Adams alleges that her role in the grievance process shields her from liability and that Craig has not sufficiently alleged facts showing that she was "on clear notice that the Plaintiff was receiving inadequate medical attention." Adams Br. at 5, ECF No. 40. Neither argument is well-taken in this case.

While it is undoubtedly true that an official who *denies* a grievance is not liable for violating an inmate's rights, that policy is based on a quasi-judicial immunity. As the Fourth Circuit noted, prison officials would be reluctant to make decisions in grievance procedures if they were subject to the threat of burdensome and expensive litigation, much of which would be "retaliatory response" to the decision. *Burt v. Mitchell*, 589 F. Supp. 186, 191 (E.D. Va. 1984).

Adams, however, was not a decision-maker in the grievance process; she was a clerical intake person.  Craig is not suing her for sending forms back to him for procedural issues.  Instead, liberally construing his Complaint and other submissions, Craig alleges that Adams was deliberately indifferent to his serious medical need.  Medical personnel are not the only ones who can be sued for deliberate indifference.  Any prison employee who is aware of a substantial risk of harm, subjectively recognizes it, and ignores the risk can be held liable for deliberate indifference.  *See, e.g., Younger v. Crowder*, 79 F.4th 373, 382 (4th Cir. 2023) (finding facts sufficient to support liability of warden for deliberate indifference to risk of harm); *Loe v. Armistead*, 582 F.2d 1291, 1293 (4th Cir. 1978) (reversing a Rule 12(b)(6) dismissal of various officials, guards, nurses, and the physician at the city jail for alleged deliberate indifference to plaintiff's broken arm).

Nor can Adams credibly say that Craig's Amended Complaint and attachments do not allege facts from which one could reasonably infer that she knew not only what treatment he was seeking, but why he considered it urgent.  The cases cited by Adams are completely distinguishable, involving cases where plaintiff complained of not having his medication, but did not communicate to non-medical personnel why he needed the medication or what would happen if he didn't have it.  *See, e.g., Moss v. Harwood*, 19 F.4th 614, 620 (4th Cir. 2021) (affirming lower court's dismissal because a jury could not find from the facts alleged that the defendants, who were not medical personnel, could have known that a delay in receiving medication created any serious risk of harm to the plaintiff).  In the present case, however, Craig's written complaints and grievances which Adams received contained detailed information on his medical condition, namely that he had fractured fingers that needed to be set correctly before he suffered

permanent injury.  It is possible for a jury to infer from such evidence, including the delays in responding, that Adams acted with deliberate indifference to Craig's serious medical need.

For these reasons, I will deny N. Adams's Motion to Dismiss.

## B.  <u>Medical Defendants – Motion for Summary Judgment</u>

To prevail on his claims of deliberate indifference, Craig must prove that he had a serious medical need and that the defendants acted with deliberate indifference to that need.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  This is a two-part test, one objective and the other subjective.  Objectively, plaintiff must show the existence of a serious medical need.  Subjectively, plaintiff must show that a defendant had actual knowledge of both the serious medical condition and the excessive risk of harm to plaintiff posed by the defendant's action or inaction.  *Phoenix v. Amonette*, 95 F.4th 852, 859 (4th Cir. 2024).  As to each defendant, whether he or she knew of the risk can be shown directly or through circumstantial evidence tending to show such knowledge, including evidence that the defendant knew of the risk because the risk was obvious.  *Gomez v. Davis*, No. 7:20-cv-00726, 2022 WL 777064, at *6.

At the outset, it is undisputed that Craig suffered displaced fractures of the fourth and fifth fingers of his right hand.  A serious medical condition exists when it has been diagnosed by a physician as needing treatment or the condition is so obvious that even a lay person would recognize the need for medical care; a medical condition is also serious if a delay in treatment can cause a lifelong handicap or permanent loss.  *Hicks v. Janiszewski*, No. 5:13CV140, 2014 WL 2778731, at *2 (N.D. WV June 19, 2014).  Numerous courts in this Circuit and elsewhere have recognized that broken bones and other hand injuries are serious medical needs.  *See Gomez*, 2022 WL 777064, at *6 and cases cited therein.

Craig primarily complains of deliberate indifference because of the delay in getting orthopedic treatment and because tongue depressors were used to make him a splint after surgery, rather than the aluminum splint recommended by Dr. Gray. His first complaint is well-taken. Deliberate indifference can be inferred from delay in treatment alone. The Fourth Circuit previously held that a delay of 22 hours in getting a broken arm treated was sufficient to state a claim for deliberate indifference, even though plaintiff was given pain medication and seen by the jail doctor in the interim. *Loe v. Armistead*, 582 F.2d 1291, 1296 (4th Cir. 1978) (stating that "[t]he unusual length of the delay provides a reasonable basis for the inference that there was deliberate indifference on the part of some or all of the state defendants."). In another case in which the plaintiff reinjured a previously fractured elbow, the court found a nine-day delay in treatment was sufficient to infer deliberate indifference. *Hunt v. Sandhir*, 295 F. App'x 584, 586 (4th Cir. 2008) (unpublished). In a case quite similar to Craig's, the plaintiff broke his right hand, but was unable to see an orthopedist for over a month after x-rays showed that his hand was broken; in finding that plaintiff had sufficiently alleged facts from which deliberate indifference could be inferred, the court noted that a month is much longer than the 22-hour delay in *Loe*. *Hicks v. Janiszewski*, No. 5:13CV140, 2014 WL 2778731, at *3 (N.D. W.V. June 19, 2014). Craig also waited a month from the March 16 x-ray until his orthopedic appointment on April 17.

The cases cited by the defense are not analogous to the present case. In both cases, the defendants had taken x-rays showing no fracture, and later x-rays, after the plaintiff continued to complain of pain, revealed the existence of fractures. *Rowe v. PrimeCare Med of West Virginia, Inc.*, No. 3:04-1246, 2009 U.S. Dist. LEXIS 86037, at *3 (S.D. W.V. Sept. 21, 2009); *Jackson v. Northampton Cty. Prison*, No. 20-CV-782, 2020 U.S. Dist. LEXIS 63166, at *6 (E.D. Pa. Apr. 10, 2020). Here, the first x-ray showed multiple fractures, not possible fractures, but fractures.

16

More x-rays were requested to evaluate whether the fracture in the fourth digit ran through a spur, not to see if there were fractures.

Craig's second complaint does not fare as well. Admittedly, he did not get the type of splint recommended by Dr. Gray. But that does not end the inquiry. The medical staff at Bland used tongue depressors to create splints for Craig's fingers. That these make-shift splints were not as effective as the aluminum splint might have been does not establish deliberate indifference. While inmates are entitled to adequate medical care, they are not entitled to the best and most expensive form of treatment. *Taylor v. Barnett*, 105 F. Supp. 483, 489 n.2 (E.D. Va. 2000). Craig's disagreement with the type of splint provided at Bland is simply a disagreement with the doctor over course of treatment, which is not deliberate indifference. *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). At most, he states a claim for medical negligence, which is not deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). His complaints about the use of tongue depressors as splints cannot survive the defendants' motion for summary judgment.

However, having determined that Craig suffered from a serious medical need for which deliberate indifference can be inferred from the delay in treatment, the next question is whether there is sufficient evidence for jurors to infer that each defendant subjectively knew of Craig's serious medical need, the excessive risk posed by their delay in getting him to an orthopedist, and their response to such knowledge. Each defendant must be judged separately on the basis of what that person knows. Each defendant has provided an affidavit in an effort to show that their actions were, at most, negligence or an error in judgment, not deliberate indifference. Likewise, Craig's original Complaint, Amended Complaint, and Response to defendants' motions are under oath and notarized. ECF 1. at 2-3; ECF 11 at 38; ECF 42 at 3. As such, his allegations are the

17

"equivalent of an opposing affidavit for summary judgment purposes, when the allegations

contained therein are based on personal knowledge." *Goodman v. Diggs*, 986 F.3d 493, 498 (4th

Cir. 2021) (internal quotation and citation omitted). The record contains, in addition to the

defendants' affidavits, the verified medical records, plaintiff's pleadings and attachments, and the

inferences that can be drawn from those. From this record, I review the actions of each defendant

to determine whether a material question of fact exists as to that defendant.

    1.  <u>Dr. Fox</u>

    Dr. Fox initially noted that his affidavit was based on his personal knowledge and on

records maintained in the ordinary and regular course of business. Fox Aff. at ¶ 2. He then

discussed information from the records regarding Craig's date of injury on March 11, 2023,

when Dr. Fox was on vacation, and when Dr. Mathena ordered repeat x-rays on March 16 after

reviewing the radiology report[2] and referred Craig for an orthopedic consultation. *Id.* at ¶¶ 3-5.

On March 21, Dr. Fox stated he reviewed the March 17 x-ray report, showing no acute fracture

or dislocation, and that "plaintiff was provided a copy of the report." Fox Aff., ¶¶ 6, 8. Dr. Fox

also indicates that he saw Craig on March 28 and April 3, 2023, and ordered continued dressing

changes until his appointment with the orthopedic doctor. *Id.* at ¶ 10. He ends with the

conclusory declaration that he was not deliberately indifferent to plaintiff's medical needs at any

time. *Id.* at ¶ 12.

    Dr. Fox asserts that he was not deliberately indifferent and that Craig was provided

appropriate medical treatment because he was given pain medication, his dressings were changed

---

[2] Of interest, Dr. Fox does not mention that the x-ray report stated that the nonstandard study position was "showing fractures of the distal phalanx of the fourth and fifth fingers (acute versus subacute)" and that the radiologist thought additional images "would be helpful . . . (especially the fourth [finger] as the fracture appears to extend through a spur.").  The facts on summary judgment must be construed in the light most favorable to Craig and whether Dr. Fox did not read that part of the March 16 report or just chooses now to downplay its significance, can also permit inference of deliberate indifference.

daily, and he saw Craig on March 28 and April 3. That health care providers at Bland provided some treatment to Craig does not mean that he has been provided *constitutionally adequate* treatment. *De'lonta v. Johnson*, 703 F.3d 520, 526 (4th Cir. 2013). As previously discussed, unreasonable delay in getting treatment for broken bones is enough to support an inference of deliberate indifference.

Dr. Fox also asserts that not all medical delays constitute deliberate indifference, that the appointment was scheduled as expeditiously as possible, and that an inmate's right to treatment is limited to that which can be provided on a reasonable cost and time basis. ECF 37 at 7–8. Those assertions, though, are disputed. Craig's allegation is that he was not seen expeditiously by an orthopedic doctor, and that is a material disputed fact. From the medical records, an inference can be drawn that no orthopedic appointment was scheduled until after Dr. Mathena's second request on March 30, 2023, that an appointment be scheduled. Dr. Mathena wrote, "[a]ppreciate Tilley expediting his ortho appt as soon as feasible, thank you." ECF 37-7at 15. While defendants assert that Mathena was thanking her for having already scheduled the appointment, review of the medical notes, including Dr. Mathena's note on March 16, indicate that he and other health care providers wrote expressions of thanks when they requested a service, not after it had been performed. *See*, *e.g.,* note of 3/14/23 and note of 3/16/23, *Id.* at 2.

Craig has alleged sufficient facts from which a jury could find that Dr. Fox was deliberately indifferent to Craig's serious medical need. I will deny his motion for summary judgment.

2.  <u>T. Cox, L.P.N.</u>

Ms. Cox was responsible for maintaining inmate medical records and for making sick call appointments for inmates.   ECF 37-2 ¶ 3.  She records doctor's orders into Sapphire, the computerized medical records system, and then signs the written chart to confirm that she has entered the item into Sapphire.  *Id.* at ¶ 4.  A cursory glance at the medical records reflects her frequent notations, in red ink, that this was entered in Sapphire, the date, and her signature.  Most significantly, Ms. Cox affirms that she cannot take any action without a doctor's order and that she did not have authority to schedule outside medical appointments, absent a direct order from the doctor. *Id.* at ¶ 5.

On March 16, 2023, Dr. Mathena wrote, "Repeat R hand x-rays per radiologist, refer to ortho-R 4th/5th finger fx's. Thx!" Underneath his order, in red ink, is written "3/16/23 scheduled T. Cox, L.P.N."  Med. R. at 2.  Ms. Cox also scheduled the first x-ray, according to her red ink notes in the margin on March 14, 2023: "noted in Sapphire, scheduled x-ray, scheduled F/U 3/22" followed by her signature. *Id.* at 2.  Given that Dr. Mathena made the ortho referral again on March 30, specifically asking Ms. Tilley (not Ms. Cox) to expedite it, one could infer that Ms. Cox scheduled the x-ray, but that the orthopedic referral fell through the cracks.  This inference would not lay the entire blame at Ms. Cox's feet, because many providers dealt with Craig on a near daily basis in March.  It is the collective failure to get the appointment scheduled in a timely fashion that raises the inference of deliberate indifference.

Because the evidence and inferences from the evidence create a material question of fact regarding who scheduled the orthopedic appointment and when it was scheduled, there is a question of material fact as to whether the appointment was scheduled as expeditiously as possible.  I must deny Ms. Cox's motion for summary judgment.

3.  <u>T. Thompson, R.N.</u>

Nurse Thompson indicates that he "acted as the health authority for administrative purposes."  Thompson Aff., ¶ 3, ECF No. 37-6.  He further states that he had "no role" in deciding the course of treatment for plaintiff or deciding when to refer someone to an outside specialist.  *Id.* at ¶¶ 4–5.  And, of course, he denies that was ever deliberately indifferent to plaintiff's medical needs.

The available evidence, however, is sufficient for a jury to decide that Thompson was, in fact, deliberately indifferent to Craig's needs.  Three different written complaints, addressed to Mr. Thompson in medical, dated from April 6 to April 10, 2023, stated that Craig was concerned about how long it was taking to see the orthopedic doctor and that he was concerned that the fingers were already healing wrong.  Compl. Attach. at 12–14, ECF No. 1-1.  Craig expressed concern that Mr. Thompson was telling Craig's family that the injury was not as bad as Craig was making it sound. Although the complaints were assigned to Thompson, the terse response, "Your appointment with ortho has been scheduled," was apparently delegated to an L.P.N. and was not responsive to the questions Craig asked.  A jury could infer deliberate indifference from his failure to be bothered with responding to the complaints and with his minimization of Craig's injuries in conversations with Craig's family.  Further, even though he was an authority "for administrative purposes," he was an R.N., had received notice of legitimate medical concerns from Craig, and could have used his administrative authority to inquire about the delay.

The same indifferent attitude is reflected in Thompson's responses to Craig's May 17 and 18 complaints that the tongue depressors were not providing the protection and stability that his fingers needed post-surgery and did not match the splint [aluminum] that had been recommended by Dr. Gray. Two of Craig's written complaints on this issue received no response (*id.* at 18, 19),

one said, three weeks after receiving the complaint, "You are receiving appropriate medical

treatment," (*id.* at 23) and in response to Emergency Grievances about pain from hitting his

poorly protected fingers or rolling over onto them during the night, the response was "This is not

an emergency." *Id.* at 24–25.  Although continued use of tongue depressor splints is not

deliberate indifference, the missing and delayed responses are potentially evidence of

Thompson's indifferent attitude to Craig's needs throughout Craig's course of treatment.  *See*

*United States v. Mohr,* 318 F.3d 613, 617–18 (4th Cir. 2003) (holding that Rule 404(b) permits

evidence of other acts for purposes such as state of mind, and this can apply to both prior and

subsequent acts).

    4.  <u>B. Pratt, R.N.</u>

    Craig's primary complaint against Nurse Pratt is that he did not refer him to the

emergency room for treatment on the night the injury occurred. Nurse Pratt contends that he

immediately called Dr. Mathena when he saw Craig's injury, and that Dr. Mathena advised him

that he need not send Craig to the ER if he could splint the finger.  ECF 37-3 ¶¶ 3-4.  Nurse Pratt

states that he then closed the wound, dressed it, and splinted the 4th digit.  *Id.* at ¶ 5.  He gave

Craig Tylenol and ordered an x-ray.  *Id.*  Nurse Pratt says that Craig's bone was "not sticking

out."  *Id.* at ¶ 6.  The medical records indicate that Nurse Pratt noted an incision across the back

of Craig's 4th digit on *left* hand that was bleeding and that he was "able to approximate wound

edge and glue."  ECF 37-7 at 1.  He dressed the wound, noting the finger was swollen, but "0

indication of a breakage noted."  *Id.*  Craig had a "slight cut" on the cuticle of his 5th finger,

which Nurse Pratt also dressed, and then he splinted the 4th finger.  After those notes, Nurse Pratt

wrote "M.D. Mathena notified."  *Id.* He then wrote that Craig was to have an x-ray of his left

hand and Tylenol 500 mg. three times a day for five days.  He told Craig to return the following day.  *Id.*

The next day, March 12, Craig came in at 12:15 p.m., and Nurse Pratt noted a large amount of bloody drainage on the dressing from the two fingers.  He applied fresh dressings on Craig's wounds and advised him to come into medical daily at 5:00 p.m. for the next two weeks to have his dressing checked.  He provided Craig with Tylenol and started him on Keflex, an antibiotic, advised by Dr. Mathena when Mathena learned that Craig had closed his hand in a window.  *Id.*; Pratt Aff., ¶¶ 7–8.  Nurse Pratt did not treat Craig any further after March 12, 2023.

Craig contends that the shift Lieutenant told Nurse Pratt to get Craig ready to be taken to the emergency room, but Nurse Pratt told him to mind his business, that he had the situation under control.  ECF No. 42 at 1; *see also* ECF 11 at 7.  He further stated that his bones were showing (not sticking out) at the first joint on both fingers. ECF 42 at 1; ECF 11 at 4.  There are disputes between Nurse Pratt and Craig regarding the nature and extent of Craig's injury and why Craig wasn't sent to the emergency room.  There is a glaring error in Nurse Pratt's notes, identifying Craig's left hand rather than his right hand having been injured.

Despite the differences between plaintiff's version of events and Nurse Pratt's, even if the jury could infer that Nurse Pratt was careless in his notes, unobservant about the extent of damage to Craig's hand, and that perhaps he had made the decision not to send Craig to the emergency room before he talked to Dr. Mathena, at best, Craig has identified, at most, medical negligence against Nurse Pratt, not a constitutional claim.  Nurse Pratt closed and dressed the injury, scheduled Craig for follow up visits with the doctor (for March 16), ordered an x-ray, and gave him Tylenol for his pain. Most significantly, he was not involved in Craig's care after

March 12. Taking the evidence in the light most favorable to Craig, the care provided by Nurse

Pratt was not deliberately indifferent.  I will grant his motion for summary judgment.

### 5.  M. Robertson, L.P.N.

Craig alleges that Ms. Robertson was deliberately indifferent based upon a single

encounter with her on May 16, 2023.  He went to the medical department to ask about how long

it should take to order a proper splint.  Craig thought Ms. Robertson was a doctor and should

have been more helpful.  Instead, she wrote Craig a disciplinary charge for being in an

unauthorized area.  ECF 11 at 7; ECF 37-4 ¶ 3.  Robertson asserts that Craig had been warned

multiple times about the rules against coming to the medical department without an appointment.

ECF 37 at ¶ 3.  Craig has not rebutted this.  Nor has Craig demonstrated in any way that Roberts

was deliberately indifferent to a medical need. I will grant her motion for summary judgment.

### 6.  L. Tilley, L.P.N.

Ms. Tilley states that she is responsible for scheduling outside medical appointments,

ordering supplies, and arranging for x-rays with mobile providers. She cannot schedule outside

medical appointments without a doctor's order.   ECF 37-5 ¶¶ 3–4.  She states that she scheduled

Craig's appointment as early as possible when she received the doctor's order (but does not say

when she received the order).  *Id.* at ¶ 5.  On April 11, 2023, she was informed by an officer that

Craig knew his appointment was on April 12, 2023; pursuant to DOC security policy, she

immediately cancelled the Wednesday, April 12 appointment and rescheduled for Monday, April

17. *Id.* at ¶¶ 6–7.

The medical records contain two different referrals to the orthopedist, one on March 16

and the other on March 30.  Both dates have red writing indicating "scheduled."  ECF 37-7 at 2,

15.  The "scheduled" note on March 16 is signed by Ms. Cox and may have referred only to the

x-ray. *Id.* at 2. The signature on the March 30 note is not readable. *Id.* at 15. Possible inferences from the evidence include that Tilley assumed from the earlier notes that Ms. Cox had scheduled the appointment and then she scheduled the appointment on March 30 in response to Dr. Mathena's request. Although Ms. Tilley apparently never called to see if the appointment could be moved up for Mr. Craig, she has stated that she could not schedule outside medical appointments without a doctor's order, and it does not appear that a doctor ever advised her to move the appointment up. At most, Ms. Tilley's failure to request an earlier appointment date is negligent, not deliberate indifference.

## IV. CONCLUSION

For the reasons stated, I will deny Ms. Adams' motion to dismiss; I will grant the defendants' motion for summary judgment as to Mr. Pratt, Ms. Tilley, and Ms. Robertson, and I will deny the Motion for Summary Judgment as to Dr. Fox, Ms. Cox, and Mr. Thompson. An appropriate order will be entered this day.

Enter: September 29, 2025

*/s/ Robert S. Ballou*

Robert S. Ballou
United States District Judge